# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: )<br><br>LUDMILA KALAYDZHAN, )<br><br>Debtor )<br><br>_____<br><br>LUDMILA KALAYDZHAN, )<br><br>Plaintiff )<br><br>v. )<br><br>STEVEN A. ROSS, TRUSTEE OF )<br>SALISBURY LENDING TRUST, )<br>QS PRIVATE LENDING LLC, AND )<br>STEVEN A. ROSS, )<br><br>Defendants ) | Chapter 13<br>Case No. 20-40020-CJP<br><br><br><br><br>AP No. 20-4026-CJP |

## MEMORANDUM OF DECISION

Before the Court is the First Amended Complaint [Dkt. No. 21][1] (the "Complaint") filed

by the debtor-plaintiff, Ludmila Kalaydzhan (the "Debtor" or "Plaintiff"), for violations of

various state and federal consumer protection laws related to a mortgage loan (the "Loan") she

obtained from Salisbury Lending Trust ("Salisbury"), of which Steven A. Ross ("Ross") is the

trustee.  Ross is also the principal and sole manager QS Private Lending, LLC ("QSPL"), which

originated the Loan.  The defendants are Salisbury, QSPL, and Ross, individually (collectively,

the "Defendants").  Of the eight pleaded counts, three remain:  Count I alleging violations of

---

[1] Adversary proceeding docket entries are identified with "Dkt. No." and main bankruptcy case docket entries are identified with "Bankr. Dkt. No." in this memorandum.

Mass. Gen. Laws ch. 93A ("Chapter 93A") related to unfair loan terms and unfair and deceptive

conduct in the origination of the Loan; Count II alleging violations of the material disclosure

requirements of the Truth in Lending Act ("TILA"); and Count III alleging violations of

disclosure and substantive requirements of the Home Ownership and Equity Protection Act of

1994 ("HOEPA"), which amended TILA by adding the provisions codified at 15 U.S.C. §§

1602(bb) (defining high-cost mortgage) and 1639 (setting forth disclosure requirements and

substantive obligations as to high-cost mortgages) (Counts I through III, collectively, the

"Counts").  The Complaint was consolidated for trial with (i) the *Debtor's Objection to

[Salisbury's] Proof of Claim No. 4* [Bankr. Dkt. No. 79] (the "Claim Objection") and (ii)

Salisbury's *Objection to Confirmation of Debtor's Second Amended Chapter 13 Plan* [Bankr.

Dkt. No. 106] (the "Confirmation Objection").

After a five-day trial and pursuant to Fed. R. Civ. P. 52(a), made applicable to this

proceeding by Fed. R. Bankr. P. 7052, the Court now enters the following findings of fact and

conclusions of law.[2]  For the reasons and on the authorities discussed below, I will enter

judgment in favor of the Defendants on each of the Counts, will overrule the Claim Objection,

and will overrule the Confirmation Objection as moot.

## I.    PROCEDURAL HISTORY

On January 6, 2020, the Debtor filed a petition for relief under chapter 13 of Title 11 of

the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended (the "Bankruptcy Code").[3]  Ross,

as trustee of Salisbury, filed a proof of claim asserting a claim in the amount of $208,700.55

secured by a mortgage on condominium units owned by the Debtor, comprised of Units 809,

---

[2] To the extent any factual finding is deemed to be a conclusion of law, I adopt the same as such, and vice-versa.

[3] Unless otherwise noted, all section references herein are to the Bankruptcy Code.

810, 909, and 910, and located at 80 Salisbury Street, Worcester, Massachusetts (the "Property").

The Debtor filed an objection to Salisbury's proof of claim, stating that "the Claim is untimely,

because it is incomplete, and therefore subject to disallowance pursuant to 11 [U.S.C.] §

502(b)(9)" and that it "contains unlawful and unconscionable fees and charges unsupported by

any agreement and in violation of various laws." *Claim Obj.*, 1.

Ross, as trustee of Salisbury, objected to confirmation of the Debtor's Second Amended

Plan (the "Plan") for several reasons, including that the Debtor failed to provide for full payment

of the claim and the Debtor filed the Plan in bad faith.  In her response to the Confirmation

Objection [Bankr. Dkt. No. 110], the Debtor stated, among other things, that should the Court

determine that Salisbury's claim is in a greater amount than what is provided in the Plan, the

Debtor would amend the Plan, but asserted that the Plan was otherwise confirmable as filed.

The Debtor subsequently filed a complaint commencing this adversary proceeding (the

"Adversary Proceeding"), in part as a further objection to Salisbury's proof of claim.  After a

preliminary hearing on the Claim Objection, the Court ordered that Salisbury file a supplement

to its proof of claim, which it did, amending the amount of its claim to $208,194.58 and

supplying additional documentation in support of the claim.  The Court then ordered that the

remaining substantive issues raised by the Claim Objection, including determination of interest,

fees, expenses, or other charges incurred, would be consolidated with the Adversary Proceeding.

In the Adversary Proceeding, the Defendants jointly filed an answer and asserted

affirmative defenses, including that (i) some or all of the counts are barred by the applicable

statutes of limitations, (ii) the Debtor failed to serve a demand letter on any of the Defendants at

least thirty days before the date that her complaint was filed, as required by § 9 of Chapter 93A;

and (iii) "[t]he [Debtor], by her acts and conduct, in representing and acknowledging to Salisbury

in affidavits that she did not reside in, or intend to reside in the Property, and that the loan was a commercial loan[,] is estopped to assert that any of the defendants now owe her anything." *Answer* [Dkt. No. 9]. The Debtor then filed the Complaint, and the Defendants restated their affirmative defenses in the answer to the amended complaint. *See Answer to Am. Compl.* [Dkt. No. 23].

Pursuant to a joint stipulation, the parties voluntarily dismissed Count IV (Violations of the Massachusetts Predatory Home Loan Practices Act), Count V (Violations of Chapter 93A: Predatory Home Loan), Count VI (Violation of Mass. Gen. Laws ch. 255E), and Count VII (Violations of Chapter 93A: Unlicensed Mortgage Lending) with prejudice and without costs or attorney's fees to any party. *See Stipulation Dismissing Certain Claims* [Dkt. No. 56]. In the same stipulation, the parties also stipulated and agreed that the Plaintiff was withdrawing any and all claims for emotional distress damages related to any count of the Complaint. Then, following my denial of summary judgment, the parties also voluntarily dismissed Count VIII (Violations of Chapter 93A: Usury) with prejudice and without costs or attorney's fees to any party. *See Stipulation Dismissing Count VIII* [Dkt. No. 95].

Regarding the three remaining Counts, the parties submitted a Joint Pretrial Memorandum in which they stipulated to certain facts. In addition, upon requests filed by the Debtor, the Court has previously taken judicial notice of certain adjudicative facts.[4] The trial was held over five days at which eleven witnesses testified, including the Plaintiff and Ross.[5] At

---

[4] The first request [Dkt. No. 99] was partially allowed by order entered at Dkt. No. 107. In that same order, the Court directed the Plaintiff to file a supplement to her request for judicial notice regarding the annual percentage rate of the Plaintiff's loan. The Court allowed the request as supplemented at Dkt. No. 120. The second request [Dkt. No. 143] was allowed on the record on the first day of trial.

[5] One witness's testimony was submitted via a deposition transcript in lieu of live testimony. *See* Dep. Tr. of Sergio Nardy Barbosa, Ex. 57.

the close of the trial, the parties submitted post-trial briefs and proposed findings and conclusions

of law.  The Court then heard closing arguments and took the matters under advisement.

The Debtor subsequently filed a third amended plan [Bankr. Dkt. No. 233] (the

"Amended Plan") in order to address issues raised by the chapter 13 Trustee in a motion to

dismiss the Debtor's case.  The Debtor significantly reduced the amount of Salisbury's claim

treated in the Amended Plan based on the assumption she would prevail on the Complaint and

Claim Objection and that damages and other remedies would be awarded.  The Defendants'

deadline to object to confirmation of the Amended Plan has been stayed pending resolution of

the Complaint and Claim Objection.  Ord. [Bankr. Dkt. No. 238].  The Confirmation Objection

on the prior Plan, therefore, is moot as the Plan has been superseded and will be overruled on

that basis.

## II.    JURISDICTION AND AUTHORITY

Subject to exceptions not applicable here, the bankruptcy jurisdiction of the district courts

extends to all civil proceedings "arising under title 11" or "arising in or related to cases under

title 11."  28 U.S.C. § 1334(b).  As the remaining Counts are asserted as an objection to

Salisbury's proof of claim, they arise under Title 11, specifically 11 U.S.C. § 502 (requiring

adjudication of objections to proofs of claim).  As against all Defendants, all three Counts are at

least "related to" the Debtor's bankruptcy case in that they (i) will determine the validity and

extent of a secured claim in the case or (ii) would, if the Debtor proves successful on the counts

against Ross and QSPL, recover damages that would augment the estate for distribution or

enable the Debtor to confirm and carry out a feasible chapter 13 plan.  *See Pacor, Inc. v.*

*Higgins,* 743 F.2d 984, 994 (3d Cir. 1984) ("An action is related to bankruptcy if the outcome

could alter the debtor's rights, liabilities, options, or freedom of action (either positively or

negatively) and which in any way impacts upon the handling and administration of the bankrupt

estate.").  For these reasons, all three remaining Counts fall within the jurisdiction given the

district courts in 28 U.S.C. § 1334(b) and referred by the district court for this district to the

bankruptcy court under a standing order of reference.  *See* D. Mass. LR 201.

    As asserted against Salisbury, all three Counts are objections to its proof of claim and

proceedings to determine the validity and extent of a lien, its mortgage, and as such are core

proceedings within the meaning of 28 U.S.C. § 157(b)(2)(B) and (K) that the Court may hear and

finally determine.  *See* 28 U.S.C. § 157(b)(1) (permitting bankruptcy court to hear, determine,

and enter judgment on core proceedings).  As against Ross and QSPL, the Counts are not core

proceedings, but the parties have consented to the entry of a final order as to all matters, *see Joint*

*Pretrial Mem.* [Dkt. No. 91], Part A, and, therefore, the Court may hear, determine, and enter

final judgment as to these matters with respect to those defendants as well, *see* 28 U.S.C. §

157(c)(2) (authorizing bankruptcy court, with all parties' consent, to hear, determine, and enter

appropriate orders and judgment in a proceeding that is not a core proceeding).

## III.    BACKGROUND AND CERTAIN FINDINGS OF FACT[6]

### a.  Ross and QSPL

1.    QSPL is a Massachusetts limited liability company that was organized by Ross on

December 8, 2009. *Joint Pretrial Mem.*, Part L ("Agreed Facts"), at ¶ 1.

2.    Ross is the current manager of QSPL and has been its only manager since it was

established.  Agreed Facts, ¶ 2.

---

[6] I also make findings of fact and inferences therefrom in my further discussion and application of applicable law in
the Analysis section.  Further, citations to the record are not intended to cite all supporting evidence.  My findings
are based on the record as a whole and may be supported by testimony and exhibits to which I do not specifically
cite.

3.      No specific evidence has been submitted as to QSPL's members.

4.      From December 9, 2009 through the present, QSPL and Ross have been engaged in trade or commerce in Massachusetts.  Agreed Facts, ¶ 3.  Specifically, they have been engaged in the business of originating and servicing loans, including the originating and servicing of the Loan that is the subject of this Adversary Proceeding.  Tr. Day 4 of Trial, Oct. 28, 2021 [Dkt. No. 180] ("Tr. Day 4"), Ross Test., 9:23–24, 35:17–20, 43:14–16, 44:8–10;  Ex. 3.

5.      In addition to being the principal of QSPL, Ross is a licensed attorney who has concentrated on real estate law for at least twenty years.  Tr. Day 4, Ross Test., 6:1–14.  Since March 1, 2013, he has been a member  of the Law Offices of Steve Ross, P.C., after previously working at Gilmartin, Magence & Ross.  Tr. Day 4, Ross Test., 105:20–106:1–5.

6.      From its inception through 2015, QSPL had no employees of its own, and anyone who worked on loans that QSPL originated during that period was an employee of Ross's law firm.  Tr. Day 4, Ross Test., 35:10–16.  At all relevant times, the employees of Ross's firm included Karen Myers, an attorney, and Jessica Ruggeri, a paralegal and assistant to Ross.  Tr. Day 4, Ross Test., 26:22–27:2; 36:9–19, 24–25; 110:6–7; *see also* Agreed Facts, ¶ 14.

**b.  The Origination of a Loan to Plaintiff**

7.      On or about March 1, 2015, the Plaintiff viewed a residential condominium listed for sale, located at 80 Salisbury Street, Unit 810, Worcester, Massachusetts.  Agreed Facts, ¶ 4.

8.      The Plaintiff informed Felicio Lana ("Lana") of her interest in purchasing the condominium, and Lana subsequently viewed the property with her.  *Id*. at ¶ 5.

9.      Lana told the Plaintiff he could assist with financing, and Plaintiff asked Lana to pursue financing on her behalf.  *Id*. at ¶ 6.

10.     Lana called Ross, who told Lana he could arrange for financing.  *Id*. at ¶ 7.

11.    On March 4, 2015, the Plaintiff's cash offer to purchase the condominium for $220,000 was accepted.  *Id*. at ¶ 8.

12.     On March 5, 2015, QSPL issued a commitment letter to the Plaintiff for a loan of $200,000. QSPL emailed the letter to Lana for delivery to the Plaintiff.  Lana delivered the letter to the Plaintiff.  *Id*. at ¶ 9.

13.    The Plaintiff engaged Attorney Jason St. Pierre ("St. Pierre") to provide legal representation in connection with her purchase of the Property.  *Id*. at ¶ 10.

14.    Plaintiff entered into a purchase and sale agreement dated March 17, 2015, to purchase the condominium for $210,000.  The agreement did not contain a mortgage contingency provision.  *Id*. at ¶ 11.

15.    The purchase and sale agreement provided for a closing date of March 31, 2015.  *Id*. at ¶ 12.

16.    Ross reviewed the purchase and sale agreement.  *Id*. at ¶ 13.

17.    On March 25, 2015, Ross's paralegal, Jessica Ruggeri, sent an email to Lana, with a copy to St. Pierre, which stated, *inter alia*, "[a]ttached please find a commitment letter as per your request," attaching a second commitment letter dated March 25, 2015 for a loan of $154,000.  *Id*. at ¶ 14; Ex. 5.

18.    Ross inspected the Property, with Lana and the Plaintiff present.  *Id*. at ¶ 15.

19.    QSPL obtained investors for the loan to be made to Plaintiff, and received the loan funds from the investors.  *Id*. at ¶ 16.

20.    The parties to the purchase and sale agreement postponed the closing to May 1, 2015.  *Id*. at ¶ 17.

21.     On April 30, 2015, Ross's office emailed to St. Pierre various closing documents to be signed by the Plaintiff, including, *inter alia*, the note, the mortgage, and two affidavits: an Affidavit of Non-Owner Occupancy; and an Affidavit of Business Purpose. *Id*. at ¶ 18.

**c. Salisbury**

22.     On April 30, 2015, Ross executed a Declaration of Trust establishing Salisbury. *Id*. at ¶ 19. Salisbury did not exist prior to April 30, 2015. Tr. Day 4, Ross Test., 102:25–103:2.

23.     At all relevant times, Ross has been the Trustee of Salisbury. Agreed Facts, ¶ 20. I have no evidence that Salisbury has ever had another trustee.

24.     The business of Salisbury is limited to the lending of money invested in Salisbury by its beneficiaries—whom Ross sometimes refers to as investors—for profit. Tr. Day 4, Ross Test., 43:2–16.

25.     Salisbury is a single purpose entity, existing to make a single loan. Promissory Note dated May 12, 2015, Ex. 7; Mortgage, Ex. 8; Declaration of Trust, Ex. 9; Tr. Day 4, Ross Test., 73:12–14, 74:4–9. At least as of the origination of the Loan in issue, it had made no other loan; and I have no evidence that it has ever made another loan.

26.     Salisbury's beneficiaries are third parties. Schedule of Beneficial Interest, Ex. 50; Tr. Day 4, Ross Test., 73:12–14, 74:4–9. No evidence has been adduced that Ross or QSPL held, directly or indirectly, a beneficial interest in Salisbury or that any beneficiary of Salisbury held his, her, or its interest as for the benefit of Ross or QSPL.

27.     From April 30, 2015 through the present, Salisbury has been engaged in trade or commerce in Massachusetts. Agreed Facts, ¶ 21.

28.     Salisbury never had a bank account, never applied for a tax identification number, and never had an employee. Tr. Day 4, Ross Test., 41:20–42:5.

29.     Salisbury funded the Loan to Plaintiff, with monies placed in the trust by its investor

beneficiaries.  Tr. Day 4, Ross Test., 43:8–16.  QSPL did not fund the Loan, *id.*, but when the

investor/beneficiaries invested funds in Salisbury, QSPL held those funds until they were needed

to fund the Loan,  Tr. Day 4, Ross Test., 24:15–25.

**d.  The Closing**

30.     The closing was postponed to May 12, 2015.  Agreed Facts, ¶ 22.

31.     On May 12, 2015, the Plaintiff appeared at St. Pierre's office for the closing. She and

St. Pierre were the only persons who attended the closing.  *Id*. at ¶ 23.

32.     At no time prior to the closing did the Defendants request or instruct the Plaintiff to

submit a loan application, and the Plaintiff did not submit an application.  *Id*. at ¶ 24.

33.     At no time prior to the closing did the Defendants request or instruct the Plaintiff to

specify the purpose of the Loan.  *Id*. at ¶ 25.

34.     At no time prior to the closing did the Defendants obtain or seek to obtain any

information regarding the Plaintiff's credit score or credit history.  *Id*. at ¶ 26.

35.     At no time prior to the closing did the Defendants obtain or seek to obtain any

information regarding the Plaintiff's income, expenses, assets, or liabilities.  *Id*. at ¶ 27.

36.     At no time prior to the closing did any of the Defendants communicate orally or in

writing directly to the Plaintiff concerning the terms of the Loan.  *Id*. at ¶ 28.

37.     At no time did the Defendants provide the Plaintiff with a RESPA "good faith

estimate" of loan costs.  *Id*. at ¶ 29.

38.     At no time did the Defendants provide the Plaintiff with the material disclosures under

section 1638(a) of TILA.  *Id*. at ¶ 30.

39.    At no time did the Defendants provide the Plaintiff with "high-cost mortgage"

disclosures under section 1639(a) of HOEPA.  *Id.* at ¶ 31.

40.    At the closing, St. Pierre presented the Plaintiff with a number of documents to sign,

including the promissory note, mortgage, assignment of leases and rents, and HUD settlement

statement.  *Id.* at ¶ 32.

41.    Plaintiff signed these documents.  *Id.*

42.    St. Pierre also presented Plaintiff with two affidavits for signature. These were an

"Affidavit of Non-Owner Occupancy" and an "Affidavit of Business Purpose" (together, the

"Closing Affidavits").  *Id.*

43.    The Affidavit of Non-Owner Occupancy stated:

> I, Ludmila Kalaydzhan, hereby state under oath that 80 Salisbury
> Street, Units 809, 810, 909[,] and 910, Worcester, Massachusetts is
> not my principal residence, nor do I intend said premises to ever
> become my principal residence. and that I reside at
> _____.
>
> I further represent and warrant that all or a majority of the loan
> proceeds will be used for commercial or business purposes.
>
> I understand that my mortgage lender is relying upon these
> representations in granting me the loan of even date.
>
> The undersigned further represents and acknowledges that she will
> indemnify and hold harmless Steven A. Ross, Trustee of Salisbury
> Lending Trust for any loss which it suffers due to reliance on these
> representations.

Ex. 11.

44.    The Affidavit of Business Purpose stated:

> I, Ludmila Kalaydzhan, individually, hereby represent and warrant
> that a majority of the loan proceeds will be used for a commercial
> or business purpose.

11

> I understand that the mortgage Lender is relying upon these
> representations in granting me the loan of even date.
>
> The undersigned further represents and acknowledges that she will
> indemnify and hold harmless Steven A. Ross, Trustee of Salisbury
> Lending Trust for any loss which it suffers due to reliance on these
> representations.
>
> Signed under the pains and penalties of perjury this 12th day of
> May, 2015.

Ex. 12.

45.    Upon presenting the Closing Affidavits to the Plaintiff for her signature, St. Pierre

believes that he would have explained to her that these were affidavits by which she would

represent that she would not be living in the condominium she was purchasing.  Tr. Day 4, St.

Pierre Test., 162:20–23.

46.    The Plaintiff and St. Pierre offered conflicting testimony about what happened next.

The Plaintiff testified that she explained to St. Pierre why she didn't want to sign the Closing

Affidavits.

> I talked about how great the condo is and how my kids are going to
> just love it[, so] I didn't anticipate this. . . . [I said] I don't want to
> sign this, and he said I have to because otherwise the loan is not
> going to be funded. . . . [I]t was clearly not what I was doing. . . . I
> was buying the condo for myself to live there. . . and not for an
> investment or some kind of business purpose.

Tr. Day 1 of Trial, Oct. 25, 2021 [Dkt. No. 177] ("Tr. Day 1"), Kalaydzhan Test., 133:4–25.  St.

Pierre testified that he didn't recall a specific conversation about the Affidavit of Non-Owner

Occupancy but assumed that he just informed the Plaintiff "what it was."  Tr. Day 4, St. Pierre

Test., 162:22–23.  St. Pierre testified that the Plaintiff had not stated to him that she didn't want

to sign the Affidavit of Non-Owner Occupancy or that the representations in the affidavits were

untrue.  Tr. Day 4, St. Pierre Test., 162:24–163:1.  He further testified that he had not told her

that she had to sign the document or else the loan wouldn't go through.  Tr. Day 4, St. Pierre

Test., 163:6–8.

47.     The Plaintiff testified that St. Pierre informed her that executed Closing Affidavits

were a necessary condition of Salisbury's funding the loan.  Tr. Day 1, Kalaydzhan Test.,

133:13–15, 134:15–18.  The Plaintiff testified that it was the first time she was informed that the

loan was contingent on (i) its purpose being commercial and not for acquisition of property she

intended to use as a principal residence or (ii) the receipt of signed affidavits containing

averments to that effect.  Tr. Day 1, Kalaydzhan Test., 132:17–134:18.

48.     Plaintiff signed the Closing Affidavits.  Agreed Facts, ¶ 32.  She testified that she did

so for several reasons.  She had already put money down, a $10,000 deposit on the purchase and

sale and the $5,000 commitment fee for the Loan, and had spent money preparing for the move.

Tr. Day 1, Kalaydzhan Test., 134:19–135:9.  She had already told her landlord that she would be

moving at the end of the month, and therefore did not feel she had the option of staying beyond

then and finding alternate living space for herself and four children in a short time would be

nearly impossible.  Tr. Day 1, Kalaydzhan Test., 136:13–19.  She had also told her children that

they were moving and had made arrangements to move.  Tr. Day 1, Kalaydzhan Test., 134:21–

23.  She testified: "I didn't feel that the other option was a good option for me at that moment."

Tr. Day 1, Kalaydzhan Test., 134:24–25.

49.     To complete the Affidavit of Non-Owner Occupancy, the blank line on which to state

the address where the Plaintiff then resided needed to be filled in.  Ex. 11.  The Plaintiff testified

that she did not feel comfortable filling this in.  Tr. Day 1, Kalaydzhan Test., 135:25–136:2.  She

would be moving out, and therefore would not be using that address.  Tr. Day 1, Kalaydzhan

Test., 136:13–22, 167:2–5.  She stated that St. Pierre told her to use an address at which she

could get mail so she decided to use 18 Gates Road, Worcester—a property that she and her estranged husband still owned that had a mailbox she could use—even though it was not where she then resided. St. Pierre wrote this address on the blank line.  Tr. Day 1, Kalaydzhan Test., 135:17–136:7, 199:8–21.

50.     St. Pierre issued a lender's title insurance policy to Salisbury in connection with the Loan.  Agreed Facts, ¶ 38.

51.     On May 13, 2015, St. Pierre caused the deed, mortgage, and assignment of leases and rents to be recorded and disbursed the Loan proceeds from Salisbury to the seller of the Property. *Id.* at ¶ 39.

### e.  Events After the Closing

52.     After the closing, QSPL serviced the Loan for Salisbury.  Tr. Day 4, Ross Test., 43:14–16.

53.     Subsequent to the closing, the Plaintiff made interest-only loan payments in the amount of $1,796.67 per month through the month of June 2019.  Agreed Facts, ¶ 40.

54.     When payments were received from the Plaintiff on her Loan, QSPL, as the Loan's servicer, would initially deposit them into a QSPL bank account.  QSPL then distributed these funds to the investor/beneficiaries in appropriate amounts.  Tr. Day 4, Ross Test., 45:12–18.

55.     The Plaintiff defaulted on loan payments.  Agreed Facts, ¶ 41.

56.     A foreclosure auction was scheduled for January 7, 2020, at 10:00 a.m.  *Id*. at ¶ 42.

57.     On January 6, 2020, Plaintiff filed a *pro se* chapter 13 petition in this Court.  *Id*. at ¶ 43.

58.     At the time of her chapter 13 filing, Plaintiff resided at the Property.  *Id*. at ¶ 44.

IV.    **ANALYSIS**

a. **Burdens**

The Counts before the Court are asserted in part as objections to the proof of claim filed

by Salisbury in this bankruptcy case.  Effectively, the counts constitute counterclaims that the

Plaintiff interposes as affirmative defenses of recoupment or setoff because affirmative relief is

precluded by applicable statutes of limitation.  A proof of claim executed and filed in accordance

with the Federal Rules of Bankruptcy Procedure constitutes prima facie evidence of the validity

and amount of the claim.  Fed. R. Bankr. P. 3001(f); *see also Juniper Dev. Grp. v. Kahn (In re*

*Hemingway Transp., Inc.)*, 993 F.2d 915, 925 (1st Cir. 1993).  In order to rebut this prima facie

evidence, the objecting party must produce "substantial evidence."  *United States v. Clifford (In*

*re Clifford)*, 255 B.R. 258, 262 (D. Mass. 2000) (citing *In re Hemingway Transp.*, 993 F.2d at

925).  If the objecting party produces substantial evidence in opposition to the proof of claim,

and thereby rebuts the prima facie evidence, the burden shifts to the claimant to establish the

validity of its claim.  *In re Hemingway Transp*, 993 F.2d at 925 ("Once the trustee manages the

initial burden of producing substantial evidence . . . the ultimate risk of nonpersuasion as to the

allowability of the claim resides with the party asserting the claim.").

The "substantial evidence" that the objecting party must produce in order to rebut the

claim's prima facia validity is "evidence which, if believed, would refute at least one of the

allegations that is essential to the claim's legal sufficiency."  *In re Everett*, No. 10–19457 (FJB),

2013 WL 3757283, at *5 (Bankr. D. Mass. July 15, 2013) (quoting *In re Alleghany Int'l, Inc*.,

954 F.2d 167, 173–74 (3d Cir. 1991)).  This means that an "objector must produce evidence

equal in force to the prima facie case."  *Tracey v. United States (In re Tracey)*, 394 B.R. 635, 639

(B.A.P. 1st Cir. 2008) (quoting *In re Allegheny Int'l, Inc.*, 954 F.2d at 173).  "If the objection

15

contains such evidence, the claimant "is required to come forward with evidence to support its

claims . . . and bears the burden of proving its claims by a preponderance of the evidence." *Id*. at

639 (quoting *In re Organogenesis, Inc.*, 316 B.R. 574, 583 (Bankr. D. Mass. 2004)). "[I]n view

of the prima facie validity of the claim, the claimant's burden of ultimate persuasion (answering

an objection supported by sufficient evidence) is a burden of persuasion only as to the particular

objection, of establishing that the defect alleged in the objection either does not exist or is no

defect." *Lyman-Cutler, LLC v. Kagan (In re Lyman-Cutler, LLC)*, 632 B.R. 355, 411–12 (Bankr.

D. Mass. 2021).

In this instance, the Plaintiff's objections to the proof of claim are affirmative defenses:

that for violations of TILA, HOEPA, or Chapter 93A, the Plaintiff is entitled to damages that

may be recouped from the claim asserted by Salisbury.  These being affirmative defenses, the

burden of proof as to them is borne by the party asserting them, the Plaintiff.  Where the

Defendants assert affirmative defenses to the TILA, HOEPA, or Chapter 93A claims/affirmative

defenses, such as equitable estoppel and the statute of limitations, the burden is on the

Defendants on those issues.

**b. Equitable Estoppel**

The remaining Counts assert claims under TILA, HOEPA, and Chapter 93A.  To prevail

on any one of these, the Plaintiff must show that the Loan at issue was a consumer loan—a loan

obtained to purchase real property in which she would live as her primary residence.  As an

affirmative defense to all the claims, however, the Defendants argue that the Plaintiff is equitably

estopped from asserting the claims because, at the closing, she signed the Closing Affidavits in

which she stated, under penalty of perjury, that she did not intend the premises to ever become

her principal residence and that a majority of the Loan proceeds would be used for a commercial or business purpose.

### i.    Choice of Law

As a preliminary matter, I must determine whether the equitable estoppel defense is governed by Massachusetts law or federal law.  The Defendants cite federal law on this defense as to all counts.  The Debtor cites Massachusetts law.  Neither the Debtor nor the Defendants addresses the choice-of-law issue.

Two of the three counts arise under federal law—Count II under TILA and Count III under HOEPA—and this litigation is brought in a federal court under federal bankruptcy jurisdiction.  As to these two counts, there is no basis to apply Massachusetts law.

The third count arises under Massachusetts law and raises the question of whether  a federal court adjudicating a cause of action under state law should apply federal law on equitable estoppel or the law of the state that governs the underlying cause of action?  In the context of whether equitable estoppel is governed by the law of the state that supplied the statute of limitations or by federal law, like the cause of action itself, there appears to be a consensus that, "federal courts do not borrow state equitable estoppel doctrine when they borrow a state statute of limitations; federal courts apply the federal doctrine of equitable estoppel." *Smith v. City of Chicago Heights*, 951 F.2d 834, 841 (7th Cir. 1992) (concluding, in contrasting the equitable tolling doctrine, that "[i]ndeed, the Supreme Court has never suggested that a federal court should borrow a state's equitable estoppel doctrine when borrowing that state's statute of limitations and tolling rules."), *id*. at 842).  In that context, the federal doctrine of equitable estoppel "owes its existence to the nature of federal courts as tribunals of justice"  the federal court will not allow itself to be used for an improper purpose. *Cange v. Stotler & Co.*, 826 F.2d

581, 587 (7th Cir. 1987) (determining that "courts will not permit a party to assert a defense, including the bar of a statute of limitations, if the defense would enable the party to take advantage of his or her own wrongdoing").  Under this reasoning, in any action brought in federal court, federal law would govern the defense of equitable estoppel, even as to a count arising under state law.

Similarly, the United States Court of Appeals for the First Circuit (the "First Circuit") has also determined in the context of a federal cause of action, a § 1983 action alleging constitutional and statutory violations in connection with revocation of a securities license, that borrows its statute of limitations from state law that "even when a federal court borrows a state's statute of limitations, the court applies federal equitable estoppel principles."  *Benitez-Pons v. Com. of Puerto Rico*, 136 F.3d 54, 63 (1st Cir. 1998) (citing *Smith*, 951 F.2d at 841).

As to causes of action that arise wholly under state law, the First Circuit has applied the doctrine of equitable estoppel of the law of the state that governed the cause of action in cases in which the federal court was adjudicating a cause of action under state law.  *See, e.g.*, *Greene v. Ablon*, 794 F.3d 133, 143 (1st Cir. 2015) (applying Massachusetts law of equitable estoppel in state law contract action); *Cahoon v. Shelton*, 647 F.3d 18, 28 (1st Cir. 2011) (applying Rhode Island law to equitable estoppel issue in suit under state Injury-on-Duty statute); *Mariasch v. Gillette*, 521 F.3d 68, 74–75 (1st Cir. 2008) (applying Delaware law to equitable estoppel issue in action under defendant's stock option plan); *Southex Exhibitions, Inc. v. Rhode Island Builders Ass'n.*, 279 F.3d 94, 104 (1st Cir. 2002) (applying Rhode Island law to equitable estoppel in suit to establish partnership rights under state law); *Steinke v. Sungard Fin. Sys., Inc.*, 121 F.3d 763, 776 (1st Cir. 1997) (applying Pennsylvania law of equitable estoppel in state law contract action).  Bankruptcy courts have also applied Massachusetts law on equitable estoppel

to Chapter 93A claims without discussion.  *See, e.g., Mitchell v. Wells Fargo Bank, N.A. (In re*

*Mitchell)*, 476 B.R. 33, 44 (Bankr. D. Mass. 2012) (applying Massachusetts estoppel standard

quoted from *Sullivan v. Chief Just. for Admin. & Mgmt. of Trial Ct.*, 858 N.E.2d 699, 711 (Mass.

2006)).  In view of the foregoing, I will apply Massachusetts law on equitable estoppel as to the

Chapter 93A claim under Massachusetts law, but note that, as will be discussed below, the result

would be no different under federal law.

### ii.    The Doctrine of Equitable Estoppel

Under federal law, equitable estoppel is part of federal common law.  *Phelps v. Fed.*

*Emergency Mgmt. Agency*, 785 F.2d 13, 16 (1st Cir. 1986) (equitable estoppel is "a judicially-

devised doctrine").  It is "an equitable doctrine invoked to avoid injustice in particular cases."

*Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 59 (1984).  It "precludes a

party to a lawsuit, because of some improper conduct on that party's part, from asserting a claim

or a defense, regardless of its substantive validity."  *Phelps*, 785 F.2d at 16.  In *Heckler*, the

Supreme Court adopted the estoppel elements in § 894(1) of the Restatement (Second) of Torts,

*see* 467 U.S. at 59, and the First Circuit, following *Heckler*, has stated:

> Courts invoke the doctrine when "one person makes a definite
> misrepresentation of fact to another person having reason to
> believe that the other will rely upon it and the other in reasonable
> reliance upon it" acts to his or her detriment. Restatement (Second)
> of Torts § 894(1) [(1979)].

*Phelps,* 785 F.2d at 16; *see also Law v. Ernst & Young*, 956 F.2d 364, 368 (1st Cir. 1992)

(setting forth the elements of an estoppel claim, quoting the Restatement (Second) of Torts §

894(1)).  This Court is, accordingly, guided in this matter by § 894(1), which articulates the

doctrine equitable estoppel as a defense and, as an affirmative defense, the burden of proof falls

on the defendant asserting it.

19

The First Circuit has set forth the requirements articulated in the Restatement (Second) in

more detail as follows:

> "(1) The party to be estopped must know the facts; (2) he must
> intend that his conduct shall be acted on or must so act that the
> party asserting the estoppel has a right to believe it is so intended;
> (3) the latter must be ignorant of the true facts; and (4) he must rely
> on the former's conduct to his injury." *Clauson v. Smith*, 823 F.2d
> 660, 661 (1st Cir. 1987). The "reliance must have been reasonable
> in that the party claiming the estoppel did not know nor should it
> have known that its adversary's conduct was misleading." *Heckler*,
> 467 U.S. at 59[.] "If, at the time when he acted, such party had
> knowledge of the truth, or . . . with reasonable diligence he could
> acquire the knowledge . . . he cannot claim to have been misled by
> relying upon the misrepresentation or concealment." *Id*. (quoting 3
> J. Pomeroy, *Equity Jurisprudence* § 810, at 219 (S. Symons ed.
> 1941)).

*Benitez-Pons*, 136 F.3d at 63. Application of the doctrine requires proof of the following

elements: (i) that the party to be estopped made a definite misrepresentation of fact to the person

invoking the doctrine, (ii) with reason to believe the other would rely on it, and (iii) that the other

relied on the misrepresentation, (iv) reasonably, (v) to their detriment.

The reliance required is reliance on the truth of the representation. The Restatement

(Second) says of the reliance requirement, as it applies to an affirmative tort claim for

misrepresentation: "[t]he maker of a fraudulent misrepresentation is not liable to one who does

not rely upon its truth but upon the expectation that the maker will be held liable in damages for

its falsity." Restatement (Second) of Torts § 548 (1977). The comment explains:

> In order to justify recovery, the recipient of a misrepresentation
> must rely upon the truth of the misrepresentation itself, and his
> reliance upon its truth must be a substantial factor in inducing him
> to act or to refrain from action. . . . It is not enough that, without
> belief in its truth, he proceeds to enter into the transaction in the
> expectation that he will be compensated in an action for damages
> for its falsity.

Restatement (Second) of Torts § 548 cmt. a (1977).  For purposes of analysis, it would seem

appropriate to apply the same rule to equitable estoppel, where the false representation is being

invoked defensively instead of offensively.  In both cases, there must be actual reliance on the

representation.  Where the reliance is solely on the ability to use the signed writing as a defense,

regardless of its truth, and not on the representation itself, a reasonable factfinder may determine

that there was no reliance.

Regarding the requirement that the reliance be reasonable, two considerations are

relevant.  First, as articulated in a comment to the Restatement (Second): "if a person

intentionally makes a misstatement with a realization that another will rely upon it, the fact that

the other fails to use due care and thus fails to discover that it is false, does not prevent him from

setting up the defense of estoppel."  Restatement (Second) of Torts § 894 cmt. d (1979). The

First Circuit has so held in the context of when cause exists to except a debt from discharge in

bankruptcy for a false representation.  Applying "the dominant common-law formulation of the

elements of fraudulent misrepresentation," the First Circuit held where the misrepresentations

were intentional, the recipient was entitled to rely on them "unless there were warning signs of

their falsity."  *Sanford Inst. for Sav. v. Gallo*, 156 F.3d 71, 74–75 (1st Cir. 1998).  In *Gallo*, the

bankruptcy court held that reliance on the debtor's statements was not justified because the

lender "could have conducted a routine title search and discovered that [the debtor] no longer

owned the home he pledged as security for the loan."  *Id*. at 75.  The First Circuit reversed,

stating that

> In light of [the debtor's] extensive and trustworthy relationship with [the
> lender] ..., [the lender] was not required to take the investigative step of
> obtaining a title search to confirm those statements. The law is clear that [the
> lender] was entitled to rely on the statements unless there were warning signs
> of their falsity, even if obtaining a title search was easy and a matter of bank
> policy.

21

*Id*. (internal citations omitted). The First Circuit concluded that "[c]ertainly, the representations of a long-time customer with a reputation for honesty and trustworthiness and an excellent track record of consistent loan repayments was a basis on which to justify reliance." *Id*. at 76. In those circumstances, it is no defense that the party relying on the intentional misstatement did not conduct such investigation as a reasonable person would have conducted in the circumstances, the rationale being that "contributory negligence is not a defense to an intentional tort." *Id*. at 74.

Even where the misrepresentation is intentional, "the reliance on misrepresentations known by the victim to be false or obviously false is not justified; falsity which could have been discovered by senses during a cursory glance may not be relied upon." *Id*. at 75. Awareness of a red flag, such as a conflict between the false statement and other representations of the maker, could obviate the possibility of reasonable reliance. The "reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." *Heckler*, 467 U.S. at 59.

Under Massachusetts law, the doctrine is stated as follows: "[c]ircumstances that may give rise to an estoppel are (1) a representation intended to induce reliance on the part of a person to whom the representation is made; (2) an act or omission by that person in reasonable reliance on the representation; and (3) detriment as a consequence of the act or omission." *Sullivan*, 858 N.E.2d at 711 (quotation and citations omitted). When the estoppel is equitable (as opposed to promissory), the representation must concern a past or present fact. *Id*. at 711 n.9 ("[U]nder a theory of equitable estoppel, there must be reliance on a misrepresentation of past or present facts, while a theory of promissory estoppel permits reliance on a misrepresentation of future intent.") (quotation and citations omitted). "All of the elements of estoppel must be present and

the party asserting the estoppel theory has a heavy burden to prove that all [three] elements are

present." *Id.* at 712 (internal quotations and citations omitted). "[T]he doctrine of estoppel is not

applied except when to refuse it would be inequitable." *Id*. at 711 (quotation and citation

omitted). As in federal law, "the reliance of the party seeking the benefit of estoppel must have

been reasonable." *Turnpike Motors, Inc. v. Newbury Grp., Inc.*, 596 N.E.2d 989, 993 (Mass.

1992). "[A] person who is confronted with inconsistent or contradictory representations may not

reasonably rely on one side of the controversy without attempting to resolve the inconsistency or

contradiction." *Mass. v. Mylan Labs.*, 608 F. Supp. 2d 127, 157 (D. Mass. 2008) (quotation and

citation omitted) (applying Massachusetts law on reasonableness of reliance as requirement of

common law fraud claim). "Explicit conflict engenders doubt, and to rely on a statement the

veracity of which one should doubt is unreasonable." *Trifiro v. New York Life Ins. Co.*, 845 F.2d

30, 34 (1st Cir. 1988) (applying Massachusetts law regarding the reasonableness of reliance for

purposes of promissory estoppel).

The federal and Massachusetts standards appear to be substantially the same. I have not

observed, and the parties have not directed me to, differences in the standards.

### iii.    The Doctrine Applied

I have found, and the Plaintiff does not dispute, that in signing the Closing Affidavits, the

Plaintiff knowingly made false statements. While testimony of St. Pierre and the Plaintiff

differed on whether there was a discussion about the Closing Affidavits, the Plaintiff testified

that she knew that the statements in the affidavits were false, but she signed them after

"look[ing] at it more." Tr. Day 1, Kalaydzhan Test., 134:10–11. The Plaintiff disputes that the

Defendants actually relied on those statements and asserts that any reliance the Defendants may

have placed on them was not reasonable. The Defendants contend that the misrepresentations

made by the Plaintiff were intentional and Defendants were under no obligation to investigate the accuracy of the misrepresentations.  The Defendants further assert that they did reasonably and actually rely on the Closing Affidavits.

While this case raises important issues related to the lending practices of Ross and QSPL, and the Plaintiff has presented evidence from which I might infer that QSPL and Ross have demonstrated an indifference to whether other borrowers were misrepresenting their intentions in other loans originated by QSPL and Ross, the facts and circumstances of the Plaintiff's Loan support application of the doctrine of equitable estoppel.

Here, the Plaintiff made false statements in the Closing Affidavits.  Beyond the normal inference that someone who makes a statement in an affidavit at a loan closing understands that the lender will rely on that statement, she testified that her counsel informed her that the lender would not close the loan if she was not able to sign the affidavit.  Regardless of whether I credit her testimony or the conflicting testimony of St. Pierre about whether there was dialogue about the Closing Affidavits, the Plaintiff claims that she understood that the affidavits were necessary for this lender to make the loan and would be relied on by the Defendants.  The overarching question is whether the Defendants <u>actually</u> relied on the representations or could have reasonably relied on the representations.

First, the Plaintiff contends that I should credit her testimony that she informed St. Pierre that the affidavits were false.  She then asserts that I should impute St. Pierre's knowledge to Ross and the other Defendants because, in addition to representing the Plaintiff as buyer and borrower, St. Pierre was also acting as the closing agent and title agent.  The Plaintiff did not testify that she believed that she was giving the Defendants notice that the Closing Affidavits were false when she informed St. Pierre.  I credit St. Pierre's testimony that he acted as

Plaintiff's attorney and that his role as closing agent and title agent was limited to those limited

roles as would be associated with closing a residential loan transaction—to ensure that the

documentation prepared by the lender or its counsel was properly executed and that instruments

were recorded with the priority established by those documents.[7]  Tr. Day 4, St. Pierre Test.,

197:1–200:14.  This testimony is consistent with Ross's testimony regarding the role of a closing

agent and title agent.  Tr. Day 4, Ross Test., 111:3–24.  St. Pierre was wearing a number of hats

when he represented the Plaintiff at the closing, but his duties as closing agent did not

necessarily conflict with his obligations as counsel to the Plaintiff.  There is no evidence in the

record that St. Pierre or anyone else communicated any facts to Ross or the other Defendants at

any time prior to closing that would conflict with the misrepresentations made by the Plaintiff in

the closing affidavits.

The direct conflict in the testimony of the Plaintiff and her former counsel, St. Pierre, is

very troubling, but a finding on whether the Plaintiff informed St. Pierre is only relevant if I

determine that notice to St. Pierre would be imputed to the Defendants.  If St. Pierre had obtained

knowledge that the Closing Affidavits were false, that would present a number of ethical and

legal issues for him.  As closing agent, he would have a duty to the lender that may conflict with

his duties as counsel to the borrower and his ethical obligations.  It is clear from her testimony

that the Plaintiff in no way intended that St. Pierre would inform the Defendants of what she

claims to have told him at closing.  She intended to close the loan because she felt she needed to

do that. Tr. Day 1, Kalaydzhan Test., 134:7–11.  She also candidly testified that she may have

---

[7] I credit St. Pierre's testimony that the signature block on the certificate of title dated May 12, 2015, Ex. 61, that
identified St. Pierre as "Attorney for Steven A. Ross, Trustee of Salisbury Lending Trust" was an error and was
generated by his firm's software, most likely from a form used in another transaction, and did not demonstrate in the
context of the other testimony and exhibits admitted regarding the closing that St. Pierre was representing as counsel
anyone other than the Plaintiff in the Loan transaction.  Tr. Day 4, St. Pierre Test., 190:17–199:14.

signed the affidavits even if she had received the forms in advance of the closing date, stating in

response to a question by her counsel on direct examination:

> Q. If you had received copies of these two affidavits on April 30th would you
> have gone through with the loan?
>
> A. I don't know. It's a difficult question.
>
> Q. Well, do --
>
> A. I am not sure. I -- I'm really not sure why -- honestly, I don't know. Prob -- I
> don't know how to answer this question.

Tr. Day 1, Kalaydzhan Test., 137:6–12.  Even if I were to accept the testimony of the Plaintiff

that she informed St. Pierre that the Closing Affidavits were false, I would not impute that

knowledge to the Defendants under these circumstances.[8]

Given that ruling, I must look to other parts of the record to determine whether the

Defendants actually relied on the misrepresentations and whether any asserted reliance was

reasonable.

Ross testified credibly that, when he approved a loan to purchase the Property, he

believed that the transaction represented a joint investment between Lana and the Plaintiff.  Tr.

Day 4, Ross Test., 51:13–52:14.  His belief was based on conversations with Lana, who was a

real estate developer and investor who had borrowed funds from Ross-controlled private lenders

in the past.  Tr. Day 4, Ross Test., 52:15–18.  This belief was also supported by the fact that Ross

believed that Lana and the Plaintiff had been involved as partners in at least one other

commercial transaction where Ross was approached for financing.  Tr. Day 4, Ross Test., 58:5–

59:7.  The Plaintiff and Lana each testified that the Plaintiff had agreed to be a "straw" to make

an offer on a property located on Austin Street in Worcester, Massachusetts.  Tr. Day 1,

---

[8] I make no comment on potential causes of action that could be held by the Plaintiff or Defendants against St. Pierre
if she did inform St. Pierre that the affidavits were false or the specific ethical issues that would be presented.

Kalaydzhan Test., 62:9–63:23; Tr. Day 2 of Trial, Oct. 26, 2021 [Dkt. No. 178] ("Tr. Day 2"),

Lana Test., 70:21–72:17.  Ross testified credibly that, until he heard Lana's testimony at trial, he

believed that the Plaintiff and Lana were partners in the Austin Street deal.  Tr. Day 4, Ross

Test., 58:17–59:17; 88:4–10.

With this background, I do not infer that Ross or any Defendant believed anything other

than that the transaction involving the Property was a commercial transaction involving Lana and

the Plaintiff.  Even a communication from the Plaintiff's counsel (who had also represented Lana

in many transactions, including transactions involving Ross) supported Ross's testimony

regarding his belief.  St. Pierre sent an email to Ross and two of Ross's employees, Karen Myers

and Jessica Ruggeri, on March 24, 2015, which was prior to issuance of a second commitment

letter, referencing the Property and stating, "I understand you are handling the private financing

on this deal for Felicio [Lana]."  Ex. 42.  St. Pierre testified that, initially, he believed that the

transaction involving the Property "was going to be another investment between [Lana and the

Plaintiff]."  Tr. Day 4, St. Pierre Test., 187:13–24.  He testified that he later came to understand

that the deal was "all with [the Plaintiff]."  Tr. Day 4, St. Pierre Test., 189:10.

The record is complicated regarding the relationship between the Plaintiff and Lana; it

was both personal, intimate at times, and business.  Tr. Day 1, Kalaydzhan Test., 60:19–20,

62:15–63:25, 154:9–13, 17–19, 155:25–156:1, 161:6–8; Tr. Day 2, Lana Test., 73:20–74:4.

Lana provided approximately $54,000 to facilitate the closing of the sale of the Property, Tr. Day

1, Kalaydzhan Test., 187:18–24, Tr. Day 2, Lana Test., 104:4–6; the Plaintiff purchased items on

credit at various times as a favor for Lana, Tr. Day 1, Kalaydzhan Test., 61:13–16, 61:19–62:8,

including the financing of a vehicle in her name that Lana drove and made the payments on, Tr.

Day 1, Kalaydzhan Test., 69:5–70:6, Tr. Day 2, Lana Test., 76:2-6, 13–17; the Plaintiff leased

commercial space from Lana at one time, Tr. Day 1, Kalaydzhan Test., 56:16–20, 154:9–13, 17–19; and the Plaintiff agreed to be a "straw" in at least two real estate transactions, Tr. Day 1, Kalaydzhan Test., 62:15–18, 63:10–14, Tr. Day 2, Lana Test., 73:20–74:4.  Based on the record, the Plaintiff and Lana were not actual investment partners in the Property or in other transactions, but none of that history was known to Ross.  Ross inspected the Property, which was four condominium units combined to be one unit.  While I do not credit Lana's testimony that the Property was "gutted out" when he visited it, Tr. Day 2, Lana Test., 81:14–83:13, nothing in the record suggests that there was any discussion with Ross at the time of the inspection or any other time regarding the fact that only the Plaintiff was involved in the transaction or that she intended to reside at the Property rather than "fix and flip" the Property with Lana.  In sum, I am unable to find that Ross or any Defendant was aware of any fact that made reliance on the representations in the Closing Affidavits unreasonable given the record in this case and the context in which the Loan was made.

This leaves the more difficult question of whether Ross and the other Defendants actually relied on the representations in those affidavits or whether the affidavits merely served as "cover" and a defense to claims, such as the ones asserted by the Plaintiff, if a loan might be found to be a "consumer loan."  The Plaintiff introduced evidence of other transactions financed by Ross-related entities where properties were owner occupied.  In some of those, similar closing affidavits had been signed at closing.  Ross testified that, at all relevant times, he understood that loans involving owner-occupied properties would likely require certain disclosures and be subject to consumer protection laws.  Tr. Day 4, Ross Test., 139:24–142:16.  He testified that his entity "QS[PL] doesn't do owner-occupied loans.  Never has and never will."  Tr. Day 4, Ross Test., 143:20–21.  Ross denied that at relevant times the closing affidavits required in connection

28

with loans made by entities he controlled were required so that the lenders would not have to comply with consumer protection laws.  Tr. Day 4, Ross Test., 139:24–140:11.  He testified that the closing affidavits require a borrower to hand write their residential address in a blank to "be extra careful" and "make sure that they understand exactly what they are doing."  Tr. Day 4, Ross Test., 140:5–11.

While evidence of other transactions in the record could lead to an inference that Ross and the Defendants may have demonstrated an indifference to the owner-occupied status of certain properties involved in other transactions, each transaction is unique and different from the transaction involving the Plaintiff's Loan and the Property.  I also observe from my experience that closing affidavits are widely used by traditional lenders to confirm due diligence with respect to a variety of issues and provide recourse if representations are not accurate.  Even if I were inclined to make such a general inference, I could not find that the Defendants did not actually rely on the representations in the Closing Affidavits in connection with the Loan involving the Plaintiff.  The preponderance of the evidence does not lead me to conclude that representations in the Closing Affidavits were not actually relied on by the Defendants in this transaction.

Ross and the Defendants accept the characterization that they are "hard money lenders." Tr. Day 4, Ross Test., 12:7–9.  This type of private lending often involves a "quicker" approval and lending process and, in this case, standardized terms dictated by the lender.  Tr. Day 4, Ross Test., 12:13–15, 39:3–14.   No credible evidence persuades me that Ross and the other Defendants utilized the closing affidavits executed by the Plaintiff as a scheme to merely to establish an equitable estoppel defense.  While the Plaintiff presented evidence regarding other loans to meet her burden to demonstrate applicability of the consumer lending statutes, that

evidence, while raising questions regarding the Defendants' lending practices, does not negate

the facts and circumstances of this case and my obligation to evaluate the evidence of whether

Ross relied on the Closing Affidavits in making the Loan to the Plaintiff.

For these reasons, the Plaintiff is estopped by the misrepresentations made in the Closing

Affidavits from asserting any of the remaining claims against the Defendants.

### c. **Issues Not Reached**

Because I have determined that the remaining claims asserted by the Plaintiff are barred

by the doctrine of equitable estoppel, I do not reach the merits of those claims. I do note that for

both the TILA and HOEPA claims (and indirectly for the Chapter 93A claim) the statute of

limitations has expired for any affirmative recovery claims. The claims may be asserted

defensively only against Salisbury as the lender holding a secured claim against the Plaintiff. To

meet the definition of "creditor" under TILA and HOEPA to subject Salisbury to the provisions

of those statutes, the lending activity of Ross and QSPL would have to be attributed to Salisbury

through a joint venture or alter ego theory because it is undisputed that Salisbury, alone, did not

make the required number of qualified loans within the applicable periods.

The Plaintiff contends that from QSPL's inception in 2009 through the making of the

Plaintiff's Loan in 2015, QSPL and Ross constituted a joint venture that in fact originated a

sufficient number of qualifying consumer loans through lending trusts that were mere alter-egos

of the joint venture. The lending trusts, she contends, had no employees and no bank accounts,

did not obtain tax ID numbers (except on the rare occasions when a trust foreclosed on

collateral), did not raise monies to fund loans, did not receive loan payments, and did not file

1098 tax forms. The Plaintiff asserts the lending trusts had no active role in any loan transaction

and existed only as straws to shield the joint venture from—among other things, if not

primarily—consumer protection statutes.  The Plaintiff further contends that Ross had no

legitimate business purpose to make the loans that QSPL originated through single-purpose

lending trusts.  In sum, the Plaintiff asserts that the joint venture of QSPL and Ross made the

Loan at issue through Salisbury as an alter ego and, thus, Salisbury qualifies as a creditor under

the TILA definition.

 The money to fund the Loan that Salisbury made to the Plaintiff came from Salisbury's

beneficiary investors.  While these investments were solicited by Ross and he arranged for this

group of investors to form Salisbury, the investors' assent was necessary, and the money that

Salisbury loaned and put at risk came from the investors, not from Ross or QSPL.  While it is

true Salisbury had no employees, it did have a trustee, Ross, and a loan servicer, QSPL, which

handled various aspects of servicing the loan for the trust.  Through these, Salisbury funded the

Plaintiff's Loan and received the payments she made on the Loan. Such profit or loss as may

result from this Loan will inure to the beneficiary investors, not to QSPL or Ross.  The evidence

is that QSPL earned a $5,000 commitment fee for originating the Plaintiff's Loan, before

Salisbury was formed, but I have no evidence as to whether, how, and how much QSPL and

Ross would be paid for their services as servicer to the loan and trustee of Salisbury.  No

evidence was adduced, nor has it even been alleged, that the trust was somehow fictitious or a

sham, that it does not in fact have beneficiaries, that its res does not consist of their collective

investment, and that this collective investment did not fund the Plaintiff's Loan.

 While I do not reach the issue of whether Salisbury is a "creditor" as required by TILA or

HOEPA, I observe that such a ruling is not obvious based on the facts in this record.  Findings

supporting alter ego or joint venture would be necessary because the direct claims against Ross

and QSPL are barred by the statute of limitations, leaving only affirmative defenses that have

been asserted against Salisbury, and those findings are not apparent from this record.  Given my

ruling that Plaintiff is estopped from asserting the claims as an affirmative defense to the claim

of Salisbury, I do not have to decide this difficult question.

A judgment regarding the Counts of the Complaint and orders regarding the Claim

Objection and Confirmation Objection consistent with this memorandum of decision shall enter.

Dated: March 26, 2024.

_____
Christopher J. Panos
United States Bankruptcy Judge